IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LABORERS COMBINED UNION OF WESTERN PENNSYLVANIA,

*Plaintiff*,

v.

A. FOLINO CONSTRUCTION CO. *and* JOHN COSTANTINO, *an individual*,

*Defendants*.

Civil Action No. 2:24-cv-1583

Hon. William S. Stickman IV

## **MEMORANDUM OPINION**

WILLIAM S. STICKMAN IV, United States District Judge

Plaintiff Laborers' Combined Funds of Western Pennsylvania ("Union") brought this action against Defendants A. Folino Construction Co. ("Folino") and John Costantino ("Costantino") (collectively, "Defendants") asserting a collection claim against Folino under the Employee Retirement Income Security Act of 1974 ("ERISA") (Count I), a breach of fiduciary duty claim under ERISA against Costantino (Count II), and a state law conversion claim against Costantino (Count III). (ECF No. 1). At a July 21, 2025, status conference, the parties agreed that a critical threshold question in this case is whether and/or to what extent the collective bargaining agreement ("CBA") is ambiguous with respect to whether fringe benefit contributions are required for travel time. They sought leave from the Court to present this issue for adjudication, which the Court granted. (ECF No. 20). The parties filed a cross-motion for declaratory judgment. (ECF

1

No. 21). They ask the Court to decide whether Folino owes back pay on fringe benefits, specifically the travel time of its laborers, for the years 2019 through 2022.[1]

## I.    FACTUAL BACKGROUND

Folino is a heavy and highway contractor performing services such as paving, milling, concrete construction, and site development. It employs approximately 190 unskilled laborers and is a member of the Constructors Association of Western Pennsylvania ("CAWP"), which negotiates CBAs on behalf of its members with various unions. Through the CAWP, Folino is a party to a CBA with the Union that governs the terms and conditions of Folino's unskilled laborers' work, including wage and fringe benefit rates. (ECF No. 22, p. 3). The CBA requires employers like Folino to make specific contributions on each laborer's behalf to various fringe benefit funds, including the Welfare Fund, Pension Fund, and Education/Training Fund. (*Id.*). These funds are administered by the Union which conducts audits annually to ensure that contributing employers are adhering to the CBA and making all required fringe benefit contributions. (*Id.*).

Costantino is the chief executive officer and corporate principal of Folino. (ECF No. 1, p. 5). At all times material to this controversy, he was responsible for overseeing collection of monies payable to Folino for laborers' work under the CBA. (*Id.*). His responsibilities also included oversight of the monthly submissions of remittance reports and fringe benefit contributions made to the funds. (*Id.* at 6). The Union alleges that Costantino, as a fiduciary, was aware of Folino's obligations to make timely fringe benefit contributions. (*Id.*).

---

[1] The claim at issue is not subject to arbitration according to the following terms of the CBA: "Failure to pay any and all wages when due and payable, violation of payments of rates of pay, and any and all legal deductions, payments for overtime work, violation of Welfare and Pension Fund contributions, and violation of Arbitration awards as set forth in this Agreement shall not be considered as subject to arbitration, and not subject to the provisions of this article." (ECF No. 22-3, p. 24).

The parties provide two exhibits which form the basis of this litigation—a CBA covering the years 2017 through 2019 and a CBA covering the year 2022. The contested language is identical in both documents. (ECF No. 23, p. 1); (ECF No. 21-2); (ECF No. 21-3). The fringe benefit funds at issue are contributions for the calendar years 2019 through 2022 audited by the Union. (ECF No. 22, p. 3). The Union's audit found that Folino failed to make fringe benefit contributions for laborers' time spent traveling between job sites within the same workday. (*Id.*). It contends that Folino owes approximately $107,000 in fringe benefit contributions that it failed to make for laborers' travel time from 2019 through 2022. (*Id.*).

The parties disagree on the history of their contractual relationship. Defendants maintain that in more than forty years of Folino contributing as an employer to various fringe benefit funds, it never made fringe benefit contributions when its laborers were performing work away from the project jobsite—like hours performed working in Folino's shop and time laborers took to travel between jobsites. (*Id.* at 4). The Union disputes Defendants' statement that Folino has never contributed fringe benefits for work performed away from the project jobsite. (ECF No. 23, p. 2). If further claims that Defendants misstate their claim that prior audits never reported an issue with travel time contributions. (*Id.*).

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure Rule 57 ("Rule 57") provides for a declaratory judgment remedy in federal courts, but "the remedy may only be granted whenever there is an actual controversy based upon independent jurisdictional grounds." *Federal Kemper Ins. Co. v. Rauscher*, 807 F.2d 345, 351 (3d Cir. 1986). Although this action is brought by both parties for declaratory judgment pursuant to Rule 57, the Declaratory Judgment Act, 28 U.S.C. § 2201, ("DJA") provides the remedy described in Rule 57—i.e., the ability to enter a judgment

3

conclusively determining whether the CBA is ambiguous. *Encompass Indem. Co. v. Rutherford*, Civil Action No. 12-144, 2012 WL 443355, at *1 (W.D. Pa. 2012). Under § 2201, a court may not enter a declaratory judgment unless it determines that it has subject matter jurisdiction over the case. *See Resco Prod., Inc. v. Int'l Union of Bricklayers & Allied Craftworkers*, Civil Action No. 20-127, 2021 WL 1197620, at *6 (W.D. Pa. 2021). Here, jurisdiction is not in question. The Union's action asserts claims arising under ERISA, a matter cognizable under the federal question jurisdiction conferred by 28 U.S.C. §1331.

A court may, but is not required, to exercise jurisdiction over motions for declaratory relief under the DJA. *Reifer v. Westport Ins. Corp.*, 751 F.3d 129, 146 (3d Cir. 2014). There are several factors a court considers in determining whether to utilize its discretion and exercise jurisdiction pursuant to the DJA:

> (1) The likelihood that a federal court declaration will resolve the uncertainty of obligation which gave rise to the controversy; (2) the convenience of the parties; (3) the public interest in settlement of the uncertainty of obligation; (4) the availability and relative convenience of other remedies; (5) a general policy of restraint when the same issues are pending in a state court; (6) avoidance of duplicative litigation; (7) prevention of the use of the declaratory action as a method of procedural fencing or as a means to provide another forum in a race for *res judicata* . . .

*Id.*

The Court holds that a declaration is warranted in this action. It will exercise its discretion and make a declaration as to whether the relevant provisions of the CBA are ambiguous. A declaration from the Court will resolve the parties' uncertainty as to what the CBA requires. Ultimately, it will streamline the determination of the causes of action asserted by the Union.

## III.    ANALYSIS

The question is whether fringe benefit contributions are required for travel time. The Union contends that the CBA unambiguously requires such contributions (ECF No. 23, p. 6), and

Defendants argue that the CBA unambiguously excludes travel time. (ECF No. 22, p. 5). In the alternative, Defendants argue that if the CBA is ambiguous, its language should be interpreted in light of past practice and the Court should consider the fact that Folino never made fringe benefit contributions for travel time. (*Id.* at 11).

## A. The governing law.

"Federal Law governs the interpretation of a collective bargaining agreement." *Sheet Metal Workers, Local 19 v. 2300 Group, Inc.*, 949 F.2d 1274, 1284 (3d Cir. 1991). The Supreme Court of the United States has held, and the United States Court of Appeals for the Third Circuit has maintained:

> A collective bargaining agreement is not an ordinary contract for the purchase of goods and services, nor is it governed by the same old common-law concepts, which control such private contracts…The collective agreement covers the whole employment relationship. It calls into being a new common law—the common law of a particular industry or of a particular plant. In order to interpret such an agreement it is necessary to consider the scope of other related collective bargaining agreements, as well as the practice, usage and custom pertaining to all such agreements.

*Transp.-Commc'n Emp. Union v. Union Pac. R. Co.*, 385 U.S. 157, 160–161 (1966); *see also Int'l Union, United Mine Workers Am. V. Racho Trucking Co.*, 897 F.2d 1248, 1254 (3d Cir. 1990). CBAs differ from ordinary contracts; however, general rules of state contract law should be used to determine the meaning of the CBA unless it is inconsistent with federal law. *Sheet Metal Workers, Local 19,* 949 F.2d at 1284.

"The paramount goal of contract interpretation is to determine the intent of the parties." *Baldwin v. U. Pitt. Med. Ctr.*, 636 F.3d 69, 75 (3d Cir. 2011). "The strongest objective manifestation of intent is the language of the contract." *Id.* at 76. The Court must interpret a written contract if "the terms and surrounding circumstances are unambiguous." *Pension Fund for Nursing Homes & Health Care Emps.—Phila. & Vicinity v. Resthaven Nursing Ctrs*, Civil

Action No. 07-0313, 2008 WL 2132097, at *3 (E.D. Pa. 2008). It cannot only interpret the contract language from its point of view, rather, it must take into consideration both parties' presentment of contract interpretation—including "the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation"—to determine whether the contract language at issue is subject to different meanings, and therefore, ambiguous. *Teamsters Indus. Emps. Welfare Fund v. Rolls-Royce Motor Cars, Inc.*, 989 F.2d 132, 135 (3d Cir. 1993) ("*Rolls-Royce*").

The relevant extrinsic evidence "may include the structure of the contract, the bargaining history, and the conduct that reflects their understanding of the contract's meaning." *Einhorn v. Fleming Foods Pa., Inc.*, 258 F.3d 192, 195 (3d Cir. 2001). The Third Circuit has emphasized a limitation on use of extrinsic evidence to assess whether terms of a contract are ambiguous, stating, "extrinsic evidence may not be used to create ambiguity where none exists." *U.A.W. v. Skinner Engine Co.*, 188 F.3d 130, 145 (3d Cir. 1999) ("*Skinner*").[2]  It explained that:

> [t]he party claiming that a contract is ambiguous must first convince the judge that this is the case…and must produce objective facts, not subjective and self-serving testimony, to show that a contract which looks clear on its face is actually ambiguous…Just as the court must determine whether a contract is ambiguous, so too the court must determine whether the extrinsic evidence offered in a given case interprets or contradicts the contract.

*Id.* It cautions against the use of extrinsic evidence when the collective bargaining agreement is complete and is not otherwise ambiguous. *Id.* at 146. Extrinsic evidence provided to substitute the contractual language should not be considered if, in view of the contract as a whole, the alleged obligations are not alluded to. *Id.*

---

[2] Extrinsic evidence may not be "subjective and self-serving" so as to create ambiguity. In *Skinner*, the extrinsic evidence proffered was oral testimony of a testifying witness who stated their interpretation of the contract was based on "past practice and conditions of negotiations…." *Skinner*, 188 F.3d 130, 145.

In *Quick v. N.L.R.B.*, 245 F.3d 231, 247–248 (3d Cir. 2001), the Third Circuit held that "extrinsic evidence of 'past practice' could be admitted, if at all, only to resolve an ambiguity in the CBA." The Third Circuit reiterated in *Skinner*:

> Although extrinsic evidence is admissible to show that a written contract which looks clear is actually ambiguous, perhaps because the parties were using words in a special sense…there must be either contractual language on which to hang the label of ambiguous or some yawning void…that cries out for an implied term. Extrinsic evidence should not be used to add terms to a contract that is plausibly complete without them.

*Id.* at 146. Thus, past practice cannot be used to "create an ambiguity" where none exists based on the plain meaning of the contract's language. *Id.* at 146. Instead, such evidence is only relevant to determine ambiguity if there are terms in the contract that are "crying out to be filled" or "the agreement is genuinely ambiguous." *Id.* at 146.

Whether there is ambiguity in a contract is a question of law. *Baldwin*, 636 F.3d at 76. "If the words of a contract are capable of more than one objectively reasonable interpretation, the words are ambiguous. Ambiguous terms that appear clear and unambiguous on their face, but whose meaning is made uncertain due to facts beyond the four corners of the contract, suffer from latent ambiguity." *Id.* As the Third Circuit explained in *Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 93–94 (3d Cir. 2001):

> Pennsylvania law on ambiguity in contracts…seems to contain a built-in tension between two principles…when a court is faced with a contract containing facially unambiguous language, it seems that Pennsylvania law both requires that the court interpret the language without using extrinsic evidence, *and* allows the court to bring in extrinsic evidence to prove latent ambiguity.

*Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001 (3d. Cir. 1980) helps resolve the tension—the Third Circuit only allowed consideration of certain extrinsic evidence for the purpose

7

of establishing latent ambiguity in the contract.[3]  A latent ambiguity claim must be "based on a 'contractual hook': the proffered extrinsic evidence must support an alternative meaning of a specific term or terms contained in the contract, rather than simply support a general claim that the parties meant something other than what the contract said on its face." *Bohler-Uddeholm*, 247 F.3d at 96.  The extrinsic evidence allowed must be offered "to support a reasonable alternative interpretation" that does not contradict the plain meaning of the language at issue. *Id.* at 94; *see also Mellon Bank*, 619 F.2d at 1011–14.[4]

The Court must assess whether the extrinsic evidence is the type that will support the proffering party's interpretation as one that is reasonable. *Id.* at 96.  In doing so, it will determine whether there is a latent ambiguity concerning the language at issue. *Id.*  Controlling authority in this circuit has further provided that when the term is "reasonably argued to be ambiguous," the Court should allow the parties to put forth evidence supporting their respective interpretations, even before determining whether the terms are ambiguous on their face, so that it can assess the ambiguity properly. *Baldwin*, 636 F.3d at 77; *see also In re New Valley Corp.*, 89 F.3d 143, 150 (3d. Cir. 1996).

---

[3] In *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 613–614 (3d Cir. 1995), the Third Circuit determined that "extrinsic evidence may be utilized to demonstrate the existence of a latent ambiguity," and that, "'[a] patent ambiguity is that which appears on the face of the instrument, and arises from the defective, obscure, or insensible language used'.... In contrast, a latent ambiguity arises from extraneous or collateral facts which make the meaning of a written agreement uncertain although the language thereof, on its face, appears clear and unambiguous." *Id.* (quoting *Steuart v. McChesney*, 444 A.2d 659, 663 (1982)).

[4] Several factors can establish ambiguity in a contract: "(1) mere disagreement between the parties over the meaning of a term is insufficient to establish that term as ambiguous; (2) each party's proffered interpretation must be reasonable, in that there must be evidence on the contract to support the interpretation beyond the party's mere claim of ambiguity; and (3) the proffered interpretation cannot contradict the common understanding of the disputed term or phrase when there is another term that the parties could easily have used to convey this contradictory meaning." *Bohler-Uddeholm*, 427 F.3d at 94–5.

The United States District Court for the Eastern District of Pennsylvania applied Third Circuit precedent when considering the role of extrinsic evidence in contract interpretation, stating, "extrinsic evidence is important only to the extent that such evidence provides 'objective indicia' that…the terms of the contract are susceptible to different meanings" adding, "a court is not required to conclude that contract language is ambiguous before admitting outside evidence that is relevant to a determination of the intent of the parties at the time of the formation of the contract." *Campbell v. Royal Bank Supplemental Exec. Ret. Plan*, Civil Action No. 19-798, 2024 WL 4380142, at *415 (E.D. Pa. 2022). Similarly, the Third Circuit stated, "extrinsic evidence is permitted because the law recognizes that the meaning of words can depend on context, and what may seem unambiguous without context…may be ambiguous when understood from the 'linguistic reference points of both the parties.'" *Am. Cyanamid Co. v. Fermenta Animal Health Co.*, 54 F.3d 177, 181–182 (3d Cir. 1995). Further, it noted, "the main focus must remain on the language chosen by the parties, and a text unambiguous when accorded the commonly understood meaning of its words cannot be disregarded unless the extrinsic evidence is such as might cause a reasonable fact finder to understand the text differently." *Id.* at 182.

If ambiguity is found (whether it be latent or patent), the Court (as factfinder), must scrutinize what the parties' intended the language to mean—and it can do so through examining the extrinsic evidence proffered by the parties. *Rolls-Royce*, 989 F2d at 135. Extrinsic evidence, such as past dealings between parties to a contract, is probative of the parties' intent and is compelling if the parties have engaged in dealings for a considerable time. *Id.* Generally, extrinsic evidence of past practice is admissible for contract interpretation "where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted

or acquiesced in without objection is given great weight in the interpretation of the agreement." *Quick*, 245 F.3d at 247.

### B. The parties' positions.

Both the Union and Defendants assert, as their primary argument, that the CBA is unambiguous and that its plain language supports their interpretation. (ECF No. 22, p. 4); (ECF No. 23, p. 3). They agree that the CBA includes terms specifically addressing fringe benefit contributions and their dispute requires the Court to interpret the phrase "[f]ringe benefit contributions will be made by the contractor on *each hour paid as wages to the employee*." (ECF No. 23, p. 6); (ECF No. 24, p. 9); (ECF No. 21-2, p. 22) (emphasis added). This is where their agreement ends. The parties have directed the Court to language that, they claim, supports their interpretations of what "each hour paid as wages" means.

Defendants maintain that the CBA "unambiguously excludes fringe benefit contributions for travel time" and proposes that the Court consider past practice between the parties to determine whether the CBA is ambiguous. (ECF No. 22, p. 5). They direct the Court to Articles 1 and 2 of the CBA. (*Id.* at 6); (ECF No 21-2, pp. 19–20). Article 1, Section 4, states: "This Agreement is intended to apply and cover all work as defined under Article II, the definition of Work Covered." (*Id.*); (ECF No. 21-2, p. 19). As such, Defendants assert that the CBA's terms, including the obligation to contribute fringe benefits, are limited in scope and apply only to "Work Covered." (*Id.*). The Article 2 definition of "Work Covered" makes no mention of travel time, which Defendants argue, indicates it is not covered by the terms of the CBA and should receive no

contribution for fringe benefits. (*Id.*).[5] Defendants emphasize that the structure of the CBA and continued use of "Work Covered" throughout the agreement reinforces its reading of the CBA.[6]

Defendants interpret "each hour paid as wages" through the lens of "Work Covered" which, they contend, does not contemplate travel time. (*Id.* at 6–7). Additionally, Defendants' reliance on the structure of the CBA leads them to assert that the language at issue references the plain language found elsewhere in the CBA. In reading the provisions jointly, Defendants assert they "make clear that for every hour the laborer is paid wages for performing 'Work Covered,' the employer must make fringe benefit contributions. If the laborer is performing duties other than 'Work Covered,' the wage and fringe benefit contribution requirements do not apply." (*Id.* at 7). Specifically, they reiterate that "travel time" is not "Work Covered," and laborers do not earn wages or fringe benefit contributions under the terms of the CBA. (*Id.* at 8).

In the alternative, Defendants argue that if the Court does not agree that the CBA unambiguously excludes travel time from the requirement of fringe benefit contributions, it should find that the CBA is ambiguous. Accordingly, the Court should look to past practices which

---

[5] Article 2, § 2 of the CBA states, in pertinent part,
> The work to be performed by employees covered by this Agreement shall be that which is commonly known in the industry as being 'Heavy Construction, Railroad Contracting', 'Highway Construction', 'Utility Construction' or 'Hazardous/Toxic Waste Material Handling, Removal and Disposal' work; and further, the work to be performed by the employees covered by this Agreement shall be in accordance with each individual Craft jurisdiction and in accordance with past practice and nothing herein contained or omitted herefrom shall be deemed waiver of such work.

(ECF No. 21-2, p. 19).

[6] Defendants identify several sections to illustrate its position: in Article 2, § 6, the definition of "workmen" includes "all other persons employed by the Contractors in the performance of either of the four classes of work covered by this agreement"; in the wages provision, Article 6, § 4, the CBA states "[t]he rates of wages set forth in Schedule of Labor will apply to all work and every workman covered by this Agreement"; and the language that links wages to fringe benefits as found in Article 6, § 5 which includes, "[f]ringe benefit contributions will be made by the contractor on each hour paid as wages to the employee." (ECF No. 22, p. 2) (underling in original).

Defendants believe indicate that the CBA does not require fringe benefit contributions for travel time. (*Id.* at 11). Defendants rely heavily on the Third Circuit's opinion in *Rolls-Royce* in which the Court found that, although the CBA appeared unambiguous on its face, after consideration of "the structure of the entire contract and the parties' course of conduct," the CBA was ambiguous specifically as to the meaning of "each employee." *Rolls-Royce*, 989 F.2d at 135–36. The Third Circuit identified provisions in the CBA which evidenced ambiguity and further found "with respect to the parties' course of conduct…Rolls-Royce never made contributions, and the plaintiff funds never requested such payments." *Rolls Royce*, 989 F.2d at 136. Finding ambiguity required the Third Circuit to analyze the parties' intent to ascertain the meaning of the CBA. *Id.* In *Rolls-Royce* past practice proved to be pivotal in the Third Circuit's conclusion—"[f]or over five years while the collective bargaining agreement was in effect, Rolls-Royce did not contribute to the funds for probationary employees," the funds never objected nor asked for such contributions, and "[t]he actions of both contracting parties are consistent with a mutual intention that Rolls-Royce not contribute for probationary employees." *Id.* at 137. If ambiguity is found here, Defendants urge the Court to similarly find that past practice is essential evidence indicating the parties' mutual intention that Folino need not contribute fringe benefits for travel time. (ECF No. 22, p. 11).

The Union asserts that the CBA unambiguously obligates Folino to make fringe benefit contributions when an employee travels between jobsites during their shift. (ECF No. 23, p. 3). In contrast to Defendants' argument, the Union suggests that the proffered extrinsic evidence of past practice attempts to create ambiguity where none exists, thus the Court should avoid considering it altogether. (*Id.* at 13).

The Union directs the Court to Article 6 ("Classification of Workmen and Scope of Wages") and Article 7 ("Working Hours and Shifts – Holidays – Emergencies") and urges it to

consider the unambiguous CBA language alone. (*Id.* at 11, 13); (ECF No. 21-2, pp. 21–22). The Union cites to the Third Circuit's opinion in *Skinner* which specifically cautioned against the use of extrinsic evidence in similar circumstances. (*Id.* at 13). The Union reads the terms of the CBA as having "only one objectively reasonable interpretation": "if the employee is paid for travel time, then the employer makes contributions on that time." (*Id.* at 8). Other provisions of the CBA, according to the Union, strengthen its claim. Article 7, §1 provides: "On all work the normal workday shall consist of eight continuous hours, exclusive of lunch time, during any twenty-four-hour period, and the normal work week shall consist of forty hours." (*Id.*); (ECF No. 21-2, p. 22). The Union reads Article 7, § 1 as unequivocally stating that employees must be paid for all eight hours of their shift. (*Id.* at 7). Further, it highlights the specific carveout, "exclusive of lunch time," insisting that if Folino intended to carveout time for travel, it would have included it as it did for lunch. (*Id.* at 8); (ECF No. 21-2, p. 22).

The Union notes that Defendants' reliance on Articles 1 and 2 of the CBA is erroneous because the provisions are "wholly unrelated to fringe benefits or wages." (*Id.*). Additionally, the Union deems Defendants' interpretation as unreasonable and illogical. (*Id.* at 10). Specifically, it questions Defendants' claim that an employee must be on a jobsite performing "Work Covered" to obtain wages and fringe benefit contributions per the terms of the CBA. (*Id.*). The Union struggles to understand Defendants' interpretation of "Work Covered" and its scope. The Union insists that it is not clear what activities an employee must be engaging in that would constitute "Work Covered" and therefore obligate an employer to pay them under the terms of the CBA. (*Id.* at 10–11).

Finally, the Union argues that past practice should not be considered and distinguishes *Rolls-Royce* from the current controversy. (*Id.* at 13). In its view, the language contained in the

13

CBA's fringe benefit provisions makes clear "that fringe contributions are owed on wage hours, full stop." (*Id.* at 13). Moreover, in response to Defendants' claim that past practice must be considered since it is included in the Article 2, § 2 definition of "Work Covered," the Union argues that "the CBA's definitions are not meant to replace the prior understanding of what local jurisdiction considers 'covered work.'" (*Id.* at 14); (ECF No. 21-2, p. 19). In its final argument, the Union states that Defendants' proffer of a 14-year-old email expressing their position that Folino does not pay fringe benefits for travel time is "subjective" and "irrelevant to the ambiguity analysis," and thus cannot be considered to determine ambiguity. (*Id.*).

Defendants' reply brief reiterates their position that it is necessary to consider past practice in the instant controversy. They explain that the proffered email indicates that the Union "knew since at least 2011 that Folino did not make fringe benefit contributions for time away from job sites," and in reference to the audits, the Union "did not identify the absence of contributions for such time as a deficiency in a single prior audit." (ECF No. 24, p. 2). Although the Union attempted to contradict Defendants' claims that they have neither previously made fringe benefit contributions for laborers' work performed off-site, nor objected to Folino's treatment of travel time, the Union did not come forth with any evidence supporting its position. (ECF No. 23, p. 2); (ECF No. 24, p. 2). The evidence is not self-serving as the Union contends—Defendants contend that the exhibits consist of an email and audits, all of which were created internally and produced by the Union itself. (ECF No. 24, p. 2).

Defendants additionally reject the Union's reliance on the Court's holding in *Skinner*, which found that extrinsic evidence should not be proffered or analyzed in the absence of ambiguity. *Skinner*, 188 F.3d at 146. Defendants cite to *IBEW Local Union No. 102 v. Star-Lo Elec.*, in which the Third Circuit held that the *Skinner* holding "does not trump" the rule established

in *Rolls-Royce* directing the Court to consider extrinsic evidence—such as past practice—to determine whether a contract term is ambiguous. (*Id.* at 3). *See also IBEW Local Union No. 102 v. Star-Lo Elec., Inc.*, 444 F. App'x 603, 607 (3d Cir. 2011). Moreover, they respond to the Union's suggestion that the inclusion of "past practice" in Article 2, § 2 "means that the definitions in the [CBA] are not meant to replace the prior understanding of what local jurisdiction considers 'Work Covered.'" (ECF No. 24, p. 10); (ECF No. 21-2, p. 19). Defendants maintain that the Union's reading of "past practice" in the "Work Covered" definition contradicts the established definition of past practice as stated in *Quick*, 245 F.3d at 247: "[a] past practice...exists where there are repeated occasions of performance by one party, and the other party accepts or acquiesces." (*Id.*).

Although Folino has paid laborers for traveling between jobsites, Defendants disagree with the Union that travel time is covered by the CBA such that Folino must contribute fringe benefits. (ECF No 24, p. 5). Defendants maintain that the Union is ignoring that the phrase "each hour paid as wages" only refers to wages earned by workmen performing "Work Covered" under the agreement. (*Id.*). The agreement, as understood by Defendants, does not ensure wages and benefits for activities outside the scope of the agreement, even if the employer is otherwise paying them for such services.[7] In response to the Union's assertion that the "Work Covered" definition creates an unreasonable question as to what constitutes covered performance—thus obligating Folino to pay wages and fringe benefits—Defendants reiterate, "the answer is straightforward: the

---

[7] Defendants provide an example: when laborers are scheduled to work at Folino's shop, they do not receive fringe benefit contributions. Although Folino schedules them to work in the shop as part of their 8-hour shift, and pays them for that off-site time, the work at Folino's shop is not included in the "Work Covered" definition. Therefore, it is not covered by the CBA. Moreover, the Union has not identified shop time as a deficiency and violation of the CBA in any of its audits. (ECF No. 24, p. 8–9).

employees must be on the job site where one of the four classes of 'Work Covered' is being performed." (*Id.* at 6).[8]

Defendants additionally rebut the Union's reliance on Article 7, which provides that a normal schedule includes 8-hour shifts. (*Id.* at 8); (ECF No. 21-2, p. 12). Defendants contend that Article 7 is unrelated to fringe benefit contributions—it only identifies how many hours per day an employee must be scheduled, not how many hours a day an employee must receive wages (and fringe benefit contributions) for "Work Covered." (*Id.*). Regardless of whether the Court finds the disputed term ambiguous, Defendants maintain that past practice must be considered to understand the language at issue. (*Id.* at 9–10).

### C. The language of the CBA unambiguously requires contributions for all time paid as wages.

Having reviewed the terms of the CBA, the Court holds that they are not ambiguous concerning when fringe benefit contributions are required. In making this determination, the Court holds that the contractual definitions of "Work Covered" at Articles 1 and 2, relied upon by Defendants, are neither controlling nor relevant for determining whether the CBA requires fringe benefit payments for travel time. Those terms only address the general scope of the tasks employees must perform under the CBA. (ECF No. 21-2, pp. 19–20). They make no mention of, and no provision for, compensation or contribution for fringe benefits—much less whether contributions are required for travel time. The definitions at Articles 1 and 2 neither unambiguously mandate fringe benefit contributions for travel time, nor render the requirement for such contributions ambiguous in light of other contractual provisions.

---

[8] Defendants cite federal prevailing wage statutes and regulations. 40 U.S.C. § 3142(c) provides that CBA terms requiring prevailing wage and fringe benefit rates for construction projects "only apply when the employee is working on the job site." (ECF No 24, p. 7).

Rather than the general definitions of the work covered, the Court holds that the CBA's terms governing compensation, and, in particular, those actually addressing fringe benefit contributions are more relevant and, indeed, dispositive. The CBA includes provisions that specify when and how fringe benefits must be paid. Article 6 § 5 states:

> ***Fringe benefit contributions will be made by the contractor on each hour paid as wages to the employee***. If wages are paid at the straight time rate then fringe benefits are to be paid at the same rate. If wages are paid at the time and one half rate, then fringe benefits are to be paid at the time and one half rate. If wages are paid at the double time rate, then fringe benefits are to be paid at the double time rate. All fringe benefit contributions will be distributed among the designated fringe benefit funds and paid on a specified rate per hour.

(ECF No. 21-2, p. 22) (emphasis added). The Court holds that this language unambiguously requires fringe benefit contributions to be made, as it says, "on each hour paid as wages to the employee." The manner in which contributions must be made is amended by Addendum 2 – Article 5 ¶ 3 to the CBA:

> Fringe benefit contributions will be made by the contractor on each hour paid as wages to the employee. All fringe benefits are to be paid on a straight time basis for all hours worked. Fringe benefits and the amounts to be paid are as noted in this Addendum. The conditions of payment of fringe benefits are those described in the standard CAWP Heavy Engineering, Railroad Contracting, Highway Construction and Utility Construction Agreement(s).

(ECF No. 21-2, p. 11). The Court holds that the Addendum modifies the language of Article 6 §5, but only to the extent that it changes how fringe benefits are paid in conjunction with overtime rates. "Straight time basis for all hours worked" is used in this paragraph of the addendum as opposed to the language in Article 6 § 5, which states that contributions will be paid at the same rate wages are paid (e.g., at time and a half). (*Id*. at 22). Thus, the plain and unambiguous language of the CBA, as modified by Addendum 2, mandates that Folino make fringe benefits contributions for all hours paid as wages, but only at straight time amounts.

Defendants point to the term "hours worked" in Addendum 2—Article 5 as excluding travel time from its obligation to pay fringe benefits, but Defendants read too much into the addition of "hours worked" to the Addendum.  It does not change the general requirement governing fringe benefit contributions.  The immediately preceding sentence unambiguously reiterates that "[f]ringe benefit contributions will be made by the contractor on each hour paid as wages to the employee." (*Id.* at 11).  The term "hours worked" modifies the language as to the amount of fringe benefit contributions required by the agreement.  It does not require payments to be made at overtime rates (such as time-and-a-half) but only on a straight time basis for hours worked.  The Court holds that the "hours worked" language in Addendum 2 does not modify the requirement that fringe benefit contributions be paid for all hours paid as wages.  Nothing in the CBA nor the Addendum supports a reading of the contractual language to exclude travel time from the requirement to make fringe benefit contributions, provided that travel time is compensated by Folino as wages.  In other words, the Court holds that, to the extent that Folino includes travel time in the hours "paid as wages," it must make contributions for fringe benefits as well.

**D.  If Folino paid for travel time as wages, it owes associated fringe benefits.**

The Court's declaration that fringe benefit contributions must be made for travel time, as long as Folino paid wages for laborers' travel time, does not answer the ultimate question in this case—whether Folino was obligated to make such contributions.  The issue of whether the CBA mandates payment as wages for travel time was not the focus of the parties' arguments in their cross motions.  Defendants do not specifically address the issue.  The Union addresses the issue, but only secondary to its argument with respect to how the CBA addresses fringe benefit contributions.  To the extent that the parties directly or indirectly address the issue, they disagree as to what the CBA provides as well as their past practice.

Defendants' position on whether the CBA mandates payment for travel time is implicit in their argument, as the Court addressed above—under the contractual language of the CBA, Folino does not have to pay for travel time. While Defendants' argument focuses on fringe benefit contributions specifically, it also implicates whether the CBA obligates Folino to compensate workers for travel time as wages. In other words, because the CBA only applies to the "Work Covered" at Articles 1 and 2 of the CBA, and because travel time is not "Work Covered," according to Defendants, there is no obligation to make contributions for travel time. Implicit in their position is an interpretation of the CBA that does not require payment as wages for travel time.

The Union counters that the CBA unequivocally requires Folino to pay for travel time. It points to the provisions in the CBA governing the scope of wages, working hours, and shifts set forth at Articles 6 and 7. The relevant terms, cited by the Union, include the following:

> The rates of wages set forth in Schedule of Labor will apply to all work and every workman covered by this Agreement.

Article 6, § 4. (ECF No. 21-2, p. 22).

> On all work the normal work day shall consist of eight continuous hours, exclusive of lunch time, during any twenty-four hour period, and the normal work week shall consist of forty hours.

Article 7, § 1. (*Id.*).

> This day shift shall consist of eight hours exclusive of lunch time, and all time worked in excess thereof shall be paid on an overtime basis.

Article 7, § 3. (*Id.*).

> Each shift shall receive 8 hours pay if working a 5 day, 8 hour shift schedule. When less than a full shift is worked on second or third shift, paid-time shall be computed pro-rata on a portion of work. All time worked in excess of a normal shift shall be considered overtime.

Article 7, § 7(g). (*Id.*). According to the Union, the provisions of Articles 6 and 7 include travel time within the scope of the contractually mandated work day.

There is no question that the CBA defines a normal work day as "eight continuous hours, exclusive of lunch time." However, the CBA makes no express mention of whether travel time is included in those eight continuous hours. There is no language in the CBA that directly addresses payment for travel time. The Court will not decide that question at this juncture. The Union's complaint does not contain a claim alleging that Folino breached the CBA by not appropriately paying wages for travel time. The focus is only on whether Folino has been deficient with respect to fringe benefits. As noted, the parties' briefs do not address the issue at length. And while the parties dispute whether Folino has made fringe benefit contributions for travel time, they do not proffer evidence as to whether Folino paid travel time "as wages." Consequently, the Court is not in a position to determine whether Folino paid for travel time "as wages."

Having held that the CBA unambiguously requires Folino to make fringe benefit contributions for all hours paid as wages, the Court leaves to the parties the question of whether Folino has, in fact, done so. If there is no dispute between the parties, the question of Folino's liability is decided. If the parties cannot agree, the issue will be determined in due course at trial.

## IV.    CONCLUSION

For the foregoing reasons, the Court holds and declares that the CBA unequivocally requires fringe benefit contributions to be paid on a straight time basis for all hours paid as wages. Therefore, if Folino included travel time in wages, fringe benefits must be paid for that time. By

Order of Court to follow, the Court will deny Defendants' motion for declaratory judgment and

grant the Union's cross-motion.

BY THE COURT:

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

12/3/2025
Dated